Good morning, Tom Schlesinger for Armando Vera. I'm going to split the time with co-counsel for El Salvador and I respectfully ask for two minutes in rebuttal. Armando raises two issues in this case, primarily the admissibility of the plea agreements as the most significant data source in establishment-relevant conduct in this case. The second issue dealt with the claim of necessity on the Title III as that might relate to sentencing manipulation. I'd like to talk about the plea agreements, the uncharged misconduct, the uncharged conduct and the need for cooperation. The total, totality of the circumstances in this case under the Jordan decision which interpreted Valencia would demand that clear and convincing evidence would be the standard that the judge should use in order to prove the uncharged conduct. What is the uncharged conduct in this case? First you've got the methamphetamine sales. Second you have the sales to the second confidential informant who is referred to in the plea agreements as CI2. Was it jointly undertaken at criminal activity? We say no. Was it even foreseeable to Armando? Those two things. We say no. The co-defendants and the government also in respect to these plea agreements had an alternative purpose in entering plea agreements. Both sides, both parties who were negotiating these plea agreements were doing so in order to obtain benefits as a result. There was certainly no incentive on the part of any of those co-defendants that we can see to challenge the factual predicates that were contained in their agreements. So therefore the agreements can't be considered inherently reliable in terms of imputing what is stated in those agreements to another person. Armando in this instance who went to trial didn't have a plea agreement. So if one were to say well they're reliable because what's contained in those predicates are statements against interest, that would be true but it would only be limited to the defendant who was pleading guilty under the agreement. It would not be true as to some third party or some other defendant. Case in point, for example, when you look at the plea agreement of Gloria Calderon, the driving force in her sentence was this 126 grams of cocaine base that she said she was responsible for and that was part of her relevant conduct. If you can recall the conversation that serves as the basis for that 126 grams, you're going to see that this was a conversation between her and Armando which dealt with an inquiry about the availability of that drug. If anything, at most it might have been a negotiation possibly to obtain this drug in the future but when it was determined that the price involved in this particular transaction was so high, it was decided not to go forward. That would not normally be considered relevant conduct under the law. But again, Gloria Calderon didn't care because she was getting a great deal under her plea agreement just like all the other defendants who pled guilty. What type of cooperation would therefore be necessary in order to establish the reliability of these plea agreements? Well unlike the district court, the government here has conceded that we can't rely on the discredited testimony of Special Agent Lavis. This court in its published opinion indicated that that testimony that was received in the trial was simply unreliable. And some of this calculation does rely on Lavis. Some of this calculation that was used to support the sentencing does rely on some of Lavis' testimony, right? It appears to because the court is saying that one of the things it's considering is the pre-sentence report. And the new pre-sentence report was part and parcel of the original pre-sentence report. There were only two distinctions. One was that you had a new probation officer assigned to the case and the second was that that probation officer conceded on the second round that you could not consider the special verdicts that were found by the jury. Other than that, all of the relevant conduct which is quoted in the pre-sentence report was identical to what you found in the first report. How did they get that information? They got that information from the testimony of Agent Lavis. One of the things that I don't understand about this case is why a new sentencing jury wasn't convened and proof put on before a sentencing jury. In the second round? In the second round. That was the government's decision. We thought about that and thought, well, doesn't the jury weigh in on that? And the answer is no, because what the government did was they fell back to the default provision under Section 841 to say that they weren't going to seek mandatory admittance in the case. I'd like to reserve that time if I could. Oh, yeah. Are you done with your time? We're going to split it. Seven and a half minutes each. Okay, go ahead. All right. Thank you very much. Thank you. That was an excellent watching of the clock. Usually people don't do such a good job. Good morning. If it pleases the Court, Gretchen Fuselier on behalf of Salvador Reyes-Vera. And for clarity purposes, I will refer to him as Salvador since his case has been consolidated  in the case. I'd like to address the argument that the Court committed clear error by enhancing the role adjustment, by adjusting his role culpability, by increasing his offense level by four levels on the basis that the Court found that he was an organizer, leader of the drug trafficking activity in Bishop Manor area. The government in that argument relies on three categories of evidence to support its position. The testimony of Gerardo Reyes, who was CI1 in the trial, and Detective Franks. And in looking at the government's argument on that, they referred to their excerpts at pages 143-144 regarding Gerardo Reyes' testimony and pages 108-210 for Detective Franks' testimony. If you look at that testimony that the government asserts, it is essentially general information about the Mini Street Lopers gang. Except for Reyes' testimony that he did know Salvador because he lived in Bishop Manor on and off during the 90s, he said nothing about knowing that Salvador had exercised authority over all of the drug trafficking in the area and would enforce the authority through violence, as the government suggests by these excerpts. Next the government indicates that it's relying on its excerpts at pages 263-265, 277-279, and 243, 264, and 278 to establish that the organizing characterization, organizer characterization is established because Salvador at times would defer to Armando as far as price. If we look at the level of evidence required by the courts to establish an organizer's role, we have the case which we cited of U.S. v. Doe, which was decided by this case, by this court in 2015. And in the Doe case, it was clear that the level has to be equivalent to a coordinator. For example, one who puts together the deals, negotiates the type, the quantity, price of the drugs for each transaction, and ensures that the participants arrive when and where they are needed for the accomplishment of the enterprise. So looking at the government's excerpts, which it cites in support of its argument, we see excerpt page 263-265, which is a phone call from Shorty, who is also known as Goy Cochea Chavez, whose activity was all with Armando, not with Salvador in looking at his plea agreement. And he calls asking if Armando, I mean, excuse me, if Salvador knows Ritchie's phone number because Shorty is interested in getting some drugs from Ritchie. Salvador says no, and obviously this short conversation is not indicative that Salvador exerts any type of control over the drug activity. The government next refers to a conversation between Salvador and Pinky, who calls Salvador, also asking for a white one and the price. Salvador says he doesn't know, asks Armando. And we have additional conversations that have this same benign type of content. Nothing establishes that Salvador exerts violence in order to protect. What about, wasn't there testimony by Reyes, or maybe it was somebody else, that to the effect that Salvador doesn't pay any taxes, and so, because he played a leadership role, and if you weren't one of his authorized dealers and you got caught, you would be beaten up. Isn't that indicative of a leadership role? Well, if there is evidence that specifically indicates that a particular person does not pay taxes to the higher levels and echelons of the mini-street loper gang, yes, that would be an item of evidence. But my recollection is that Reyes was speaking generally about the culture of the mini-street lopers, that he did not know who the suppliers were, he never heard of the suppliers related to Salvador. So we don't have any specific evidence that links Salvador to actually paying taxes. We don't have anything in the intercepted telephone calls. And when we rely only on the evidence of Reyes, that is suspect because of his, his background as far as having multiple convictions, being in and out of prison, and even when he was cooperating with the government, he violated his parole and was returned to prison. So I think when we look at the content of all of the conversations in the government's excerpts, we see that it does not satisfy the elements of controlling to the degree necessary under Doe, the various parties who are basically in their own elements of drug trafficking. We know that Madrigal, for example, and the government concedes this, had a, was in a conspiracy with Higedera Lopez, as well as Orihal. They would meet under, with CI2, which was never related in the trial, as I recall, to sell drugs independent of anything that Salvador was involved with. So we have these parallel conspiracies, and we have no link that Salvador had any kind of control over them. Matter of fact, in one of the conversations Salvador had with Pinky, he invited him to a, to a baptism, and then he, not, excuse me, with Richie, he asked, could you do me a favor? That's not someone who has control over another drug dealer. That's someone who is searching on his own for perhaps whatever he was looking for at that time. Wasn't there evidence in the plea agreements and that contained in the factual basis of several of the plea agreements that they, I don't know, that they obtained their drugs from Salvador and Armando? Well, we have six plea agreements that the district court accepted in relationship to Salvador, and those were Higedera Lopez, Goetia Chavez, Camacho, Orihal, Duarte Aguilera, and Julio Almada. Of those six, we have the separate conspiracies involving Goetia Chavez and Higedera Lopez. And when we look at the case of Garcia Sanchez, we know that the court is required in drug conspiracies to undertake an individualized evaluation and sentence a defendant only on that quantity that he is responsible for, not for the entire quantity. The courts did not apparently do that when we look at the sentencing transcript. And I would also like to say that as far as the plea agreements, the plea agreements were entered at the time before the first appeal, and the object was to resolve and get some kind of concessions for those respective defendants, co-defendants. So if we look at the purpose of those plea agreements, we might coalesce it, I guess, with the case of N. Ray Slatkin, which we also cited in our brief. And in that case, it indicated that Slatkin, who was prosecuted for fraud, he entered into a plea agreement, and his incriminating statements were attempted to be used against third persons, his investors, in order to establish bankruptcy fraud as well. But that court held that the fraudulent intent could only be considered relating to Slatkin himself. It could not be transferred to be considered against the investors who were third parties. And I think there is some parallel in our particular case, given what Mr. Schlesinger has argued already. I would like to reserve the rest of my time for any rebuttal. All right. You're over your time, but I'll give you some rebuttal. Thank you. Good morning, Your Honors. May it please the Court for Amald and for the United States. There are multiple routes to the same result here, which is that the District Court's drug quantity determination was not clear error. I want to try to convey to the Court what I think is the simplest route to that conclusion. Now, there are two principles here. The District Court used a base offense level of 30, which corresponds to a marijuana equivalence of 720 kilograms. So the question then becomes whether there is enough in the record for the District Court to have reasonably gotten from 28, Armando's expert's estimate, to 30, the level that the District Court used, or from 720 kilograms, Armando's expert's estimate, to 1,000 kilograms, just 280 kilograms higher. The government would submit that even without looking at the co-defendant's plea agreements, there are plenty of ways to get there. Armando's expert did not look at co-defendant's plea agreements whatsoever. His entire analysis was based on a review of intercepted phone calls that were introduced at trial. However— Can I ask you to clarify the premise of your argument that we start with 30? The District Court, in this case, calculated the base offense level much higher, right? Was it 32, 33? So the District Court adopted the base offense level that the government calculated of 32, but then said that in order to err on the side of caution— But how do we know that if the District Court had started at a 28, that he wouldn't have gone down three levels, given that the guidelines is the starting point? So I don't know that we can assume that the District Court starts at 30 and look for the amount of drugs that correspond to 30. So the District Court went down from 32 to 30 because it was concerned that the government would be accused of being vindictive, given that it had used a base offense level of 30 in the initial sentencing, and therefore it wanted to use the same base offense level in the resentencing. I think that the question for this Court, though, is was that clear error? So in order to determine whether that was illogical or implausible or unsupported by anything in the record, it does make sense to look at the difference between what defendant's own expert, who is trying to look at this evidence in a light favorable to defendant, calculated, and what level the District Court used. And the reason I say that you don't need to look at the plea agreements whatsoever is because even defendant Armando's expert excluded massive quantities of drugs that were distributed. First, he excluded the entirety of methamphetamine. And opposing counsel points out that methamphetamine was not found by the jury. He described it as uncharged, but that's not true. This conspiracy was a conspiracy that did involve methamphetamine, and three of the other defendants pled guilty to distributing methamphetamine. But again, there's no need to look at those plea agreements because all of the methamphetamine that the government calculated and that the District Court used was based on actual seizures in this conspiracy by the second confidential informant. So that was about 79 grams of methamphetamine that was sold to the confidential informant in controlled buys at Bishop Manor, which is the apartment complex over which these defendants exercise control of the drug trade. Calculating that 79 grams of methamphetamine as a marijuana equivalence amounts to over 1,500 kilograms of marijuana. So again, the difference between the 1,000 threshold for a level 30 and the 720 kilogram threshold that Armando's expert calculated is 280 kilograms. If the methamphetamine alone amounted to 1,500 kilograms, it wasn't unreasonable for the District Court to use some quantity of that methamphetamine to arrive at a base offense level of 30. Another major unaccounted for quantity in Armando's expert's calculation is the fact that he looked at phone calls that were introduced at trial but only covered a five-month period of this conspiracy, which was alleged as a 17-month conspiracy. So based on just five months, Armando's expert calculated a marijuana equivalency of 720 kilograms. Extrapolating out from that to a 17-month conspiracy would be more than triple 720 kilograms. But again, there's no need to do so much to get to 1,000-kilogram threshold of a base offense level 30. Now, counsel, this is, I think, a very compelling argument for resentencing. I think you're making a lot of good points. The issue I have is I didn't see the District Court go into the level of analysis that you are now. Had the District Court done that, we may be in a different position here. But the District Court, if I recall correctly, said that the – I'm paraphrasing here – but one of the most important, maybe the most important factor he looked at were those plea agreements, which I appreciate why you're trying to have us look at the case aside from those plea agreements. But do you have any authority that lets us essentially kind of redo the sentencing here, maybe the way it should have been done? I don't think you were the counsel at the sentencing in this case. No, I was not. I think you're doing a pretty good job on that. But I'm not sure here we can do what you're asking us to do. Do you have any authority that allows us to engage in the analysis you're engaging in right now where that's not what the District Court did, maybe it's what the District Court should have done, but lets us kind of redo it now? So I would submit that that is a principle that is inherent in clear error review. Because the clear error standard, as this Court has made clear again and again, involves an inquiry into whether the District Court's finding was illogical, implausible, or unsupported by the record, it is appropriate for this Court to look at the entirety of the record to determine whether the District Court clearly erred. I would secondly submit that that's a principle of harmlessness review, that when the District Court arrives at a base offense level of 30, and this Court determines that it was appropriate or could have easily arrived at a base offense level of 30, pursuing a different route to the same result, that any error in the District Court's determination was therefore harmless. Counsel, how do we know that had the District Court done it the proper way, which you're advocating for now, that he wouldn't have reached a different base offense level, or higher, lower, and at least have something that's more readily reviewable than what we have in front of us right now? So I wouldn't concede necessarily that what the District Court did was wrong, and I would like to address the use of the plea agreements, but I do think that any way you slice this case — I know you didn't concede it. And that's been — I mean, it's been my question. I mean, from looking at this, I've been asking myself and my law clerks, you know, can you figure out a way that this is correct without using the plea agreements? Because obviously you started your argument without regard to the plea agreements, because you obviously didn't think that reliance on the plea agreements was your strongest argument. So shouldn't we have the District Court redo it and tell us how he would do it without regard to the plea agreements if we think that wasn't the correct approach? So I think the answer is no, because the District Court actually did look at evidence beyond the plea agreements. The District Court pointed out, as the government did, that the phone calls here corroborated the plea agreements, that the police reports corroborated the plea agreements. So one of the questions I have — and this — already I put in way too much time on this case, I honestly have — but to go through all of those phone calls again, I believe, based on looking at the probation report, that some of the phone calls that the parole officer relied upon were interpretations of the phone calls by Lavis, who we previously said was unreliable. So I would make a couple points with respect to Lavis's testimony. First, this Court specifically said in its prior opinion that some of Lavis's opinions about the meaning of recorded phone calls were permissible. So that's obviously a quote from this Court's opinion. Right. So how do we know which ones that were relied upon were permissible and which ones were not when the government, in the first place, didn't make that distinction because he was a dual testifier? That's why I think that the most conservative approach or defendant-friendly approach is to use the interpretations of defendant's own expert. So defendant's expert does exactly this analysis of the phone calls, and that is why Armando's expert's opinion is where I think the baseline should begin. And then just to consider, well, looking at that expert opinion, and I would refer the Court to Armando's expert excerpts of record at pages 198 through 203, where Armando's expert lays out all of the phone calls. These are the same trial exhibits that Lavis testified about at trial. And then to question what is left out from this analysis, and could the district court have readily concluded, based on other evidence or what is left out, that an offense level of 30 is appropriate? And the government would submit that any way you cut it, any way you look at it, any route you take, arrives at the same conclusion. Another piece of evidence that I think is really critical here that would arrive at a much higher conclusion is the testimony of the informant. He specifically testified about quantities at trial. He said that Salvador was engaged in the distribution of ounce to half-ounce quantities of crack cocaine every single day. An ounce of crack cocaine is about 28 grams, half an ounce about 14. If we just looked at the five-month period that Armando's expert is focused on, and used a half-ounce quantity for every single day during that five-month period, not the entire 17-month conspiracy, not the high-end estimate of one ounce per day that the informant provided, just a half-ounce over five months, the marijuana equivalency would be over 7,000 kilograms, pushing this base offense level up into the territory of nearly 34, well within 32, and far above the base offense level that the district court used of 30. Armando's expert paid no attention to the fact that that testimony was introduced at trial. If the government had wanted to and been extremely aggressive, it would have said, well, the testimony at trial was half an ounce to an ounce. Let's take the mid-range of that and extrapolate it out over the 17-month of this conspiracy, and arrive at a base offense level of 36 or even 38, way far higher than what the district court used. And that's why I urge this court to find that this was not clear error. A fourth piece of evidence that I think that the court should consider is the fact that Armando's expert, in his own analysis of these calls, did not count any quantity of drugs for which the drug was not specified during the call that he analyzed. Now, I think, Judge Armando, I think there's another important consideration, which is that it's very hard to determine exactly what is going on in this conspiracy, and exactly how much is being discussed in these calls. And that is why there is some level of deference that is owed to the district court's determination, and that is why the sentencing guidelines require the district court to make an approximation. Right. But, counsel, you're kind of asking us to disregard what the district court said. And then, right? Well, so, I agree with you that the district court unequivocally said that the plea agreements were the most important piece of the government's calculation, and that the district court then adopted the government's calculation, but said in the alternative it could have used the PSR. That's why it gets back to my original question of, if we were to, for example, say, and the plea agreement suggests that the court's reliance on the plea agreement is not the government's strongest argument. Let's put it that way. So, if we were to say that district court should not have relied on the plea agreement, except to the extent that every single quantity that's discussed in the plea agreement must specifically be corroborated, corroborated not as to the existence of a conspiracy and the defendant's involvement in the conspiracy, but specifically corroborated as to the quantity in the plea agreement, how do we know that the district court's decision in this case wouldn't have been different? So, the district court said, okay, the plea agreement is kind of the centerpiece of the government's argument. Now, on remand, if we were to say that, I don't know if we would, we haven't discussed the case, but if we were to say that the plea agreement is not reliable, except to the extent that every quantity discussed in the plea agreement is specifically corroborated, so on remand, the court might say, okay, now that the Ninth Circuit has said that, I'm going to basically give more weight to the presentation of the defense, and also require the government to basically specifically prove that up. So, if the district court accepts level 28, couldn't the district court then also go two, three levels, whatever he did originally, to give the defendant the benefit of that, so that there's no punitive measure for prevailing in the Ninth Circuit with regard to the expert testimony that was presented in the first trial? The records are very muddled, and so it's hard for us to discern what the district court would do in sentencing if presented with a different argument in terms of what the offense level would be. I see my time is up, may I please finish answering that? I think that I would like to focus on the plea agreements, because that is what the district court looked at, and what I would say about the plea agreements is, fact one, is the quantities in those plea agreements collectively, in the aggregate, added up to over 3,000 kilograms of methamphetamine at a base offense level of 32. The district court's ability to change if it only needs to rely upon a third of the quantity that the plea agreements actually set forth. A second point I would make about those plea agreements is that defendant Armando's expert has corroborated them. His review of the phone calls is the evidence that corroborates at least 720 kilograms of methamphetamine, sorry, of 720 kilogram marijuana equivalents, and then merely counting the actual seized methamphetamine would easily surpass, in fact, alone the methamphetamine that was actually seized as part of this conspiracy would surpass the 30 offense level threshold of 1,000 kilograms. So there is evidence that corroborates these plea agreements. In addition, the fact that 12 co-defendants named these defendants, and the rest of them specifically named Armando, is evidence that was, that did satisfy the minimal threshold of reliability for the district court to rely upon them. The only other point I would make is that there was discussion about Salvador and Armando not controlling the drug trade. That is not true. The evidence at trial was that Salvador was the head of the street gang, the mini street lopers that controlled the Bishop Manor drug trade, and it wasn't unreasonable, therefore, for the district court to use these findings in the plea agreement as relevant conduct. Frankly, it's almost impossible for the district court to reach an approximation where every single quantity is corroborated because these weren't all controlled buys. These weren't all drugs that were actually seized by the district court to use the plea agreements as they are corroborated by the phone calls, by the seized evidence, including the methamphetamine, and by the police reports and the complaint affidavit in this case. Thank you, Your Honor, for your time. Thank you, counsel. All right. You asked for two minutes. Thank you, Your Honor. I'm not sure how to prioritize the two minutes, so I'm going to start by saying that it appears that the government is suggesting even a new methodology for sentencing today, not one that the district court judge adopted, and certainly not one that a retired supervisory special agent from the DEA adopted. When you talk about a finding of a level 30 versus a 32 or a 28, you're talking about big jumps in the applicable guideline range for a defendant. So I think that it's very important to nail down exactly what the range would be. We've got a level 28 on the basis of the defense expert. That's what we got. What he has indicated is that the only direct evidence concerning relevant conduct in this case, other than the one controlled buy to CI1, are the recordings. And so the problem, as I indicated earlier with the plea agreements, is that they don't necessarily overlap part and parcel with those recordings. And when you talk about whether or not the judge should have used a clear and convincing standard as opposed to a preponderance standard, which he indicated in his order he used, has to do with whether there was clear error in using the lower standard. We would maintain that he should have used a clear and convincing evidence standard in this case because of the nature of the evidence he was considering. He was considering plea agreements of the co-defendants. I've indicated already why those on their face are not reliable without extrinsic corroborating evidence. And I'm not talking about other plea agreements to corroborate. I'm talking about other evidence, like police reports. We only have police reports as to three of these defendants, Mondragan, Borrell, and Duarte. So I have a very basic question, and maybe it just shows how confused I've gotten over this case. So my understanding of the rule on using the clear and convincing standard is that you have a base offense level, and then you use the clear and convincing standard if there's going to be an enhancement that disproportionately increases the base offense level. In this case, you're starting with zero. So your argument is that you use clear and convincing to calculate the base offense level. That's right. Well, it's both. It's the calculation, the methodology that you're using, and it's also the nature of the evidence which is being proffered in order to establish the guideline range. But where the defendant already concedes that it should be a level 28, then do you need clear and convincing to go from 28 to 30? Is that a disproportionate jump that would require clear and convincing? Well, that begs the question as to whether the government should be relying upon the defense's own expert to begin with. It would seem to me that they would want to rely upon their own evidence and their own arguments in order to establish what the sentence should be. We indicated that under the S.H.I.E.L.D. decision that the district court should have erred on the side of caution in determining what the guideline range would be. And that's why we said you should start out at a level 28, not at a higher level. We started here at a level 32. The only reason why we went down to a 30 was because the district court considered the vindictiveness argument of the co-defendant. Counsel, did Salvador join Armando's expert report? I believe he had joined everything that was filed by Armando at the district court level, yes. So the problem here is that this court has already signaled to the district court in the prior opinion that Agent Lavis's opinions resulted in the admission of specific drug quantity opinions that did not rest on reliable methods. So there's really no way for the district court to go down to 32 based upon that opinion. However, you do have another opinion of another expert to consider, and that expert came to the conclusion that the applicable range would be lower than what the district court found. And for that reason, we think that the case should be, the sentence should be vacated and the matter remanded because of the unreliable methodology that the district court used in determining the All right. Thank you, Counsel. Ms. Uciler, did you want a minute? In response to your question, Judge Owens, whether Salvador joined in Armando's expert, I don't recall seeing that at the resentencing. I do remember, and of course there's a record that the Salvador and Armando joined each other's during the trial. And I would appreciate an opportunity to review the record because I don't believe that that joined or carried over to the resentencing. Certainly. And the reason I ask is because the government is asking us to effectively use Armando's sentencing position as a floor. And it's one thing to use it against Armando. It may be another thing to use it against Salvador if Salvador did not join in. If he joined it, then maybe they have a stronger argument to use it as a floor. That's why I was asking the question. All right. And the government also relies heavily on Reyes's trial testimony that Salvador was selling a half an ounce per day, I believe he said. Without corroborating Reyes's testimony, and it's not corroborated in any of the intercepted phone calls, given his sketchy kind of background, I think it would be inappropriate and somewhat subject to a violation of due process to render a sentence which is so harsh of 324 months as a organizer based on only Reyes's testimony. I would submit it. All right. Thank you, Counsel.
judges: Wardlaw, Nguyen, Owens